# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA :

      v.             :       CR-05-344 (PLF)

ANTHONY R. BIGELOW     :

## DEFENDANT'S OBJECTIONS TO
## PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM

### Factual and Procedural Background

When Anthony R. Bigelow was just eleven years old, he was committed to the Cedar

Knoll juvenile detention facility.[1]  Prior to that time, Mr. Bigelow had been living with his

parents in Southeast.  His parents both worked – his father as a maintenance worker at American

University and his mother as a book binder at the U.S. Government Printing Office.  They are

still married today and neither can recall exactly how Mr. Bigelow first ended up in Cedar Knoll.

Neither remember him being arrested for any criminal offense, and both recall that he was first

_____

[1]In the 1970s, Cedar Knoll was a notorious facility that was part of the District of Columbia juvenile justice system.  See In re An Inquiry into Allegations of Misconduct Against Juveniles Detained at and Committed at Cedar Knoll Inst., Dep't of Human Resources, 430 A.2d 1087, 1089 (D.C.1981) (recounting testimony at evidentiary hearings regarding "incidents of physical abuse and sexual assaults by counselors; physical attacks and beatings by other juveniles which are allowed to occur because of inadequate supervision; drug abuse by both students and counselors and distribution of narcotics to students by counselors; administration of prescription drugs by untrained personnel; and, instances where juveniles who were clearly in need of medical attention were denied access to treatment by counselors").  The testimony at the hearings held in In re An Inquiry, in 1977 and 1978, "was disturbing enough to shock even the most apathetic among our citizenry . . . [and] [f]or Judge [Gladys] Kessler, who in her role as new referrals judge in the Juvenile Branch [of D.C. Superior Court] had on occasion ordered young people confined at the Children's Center, these allegations were especially appalling . . . ."  In re An Inquiry, 430 A.2d at 1089.  The facility was later closed as part of a consent decree.  See District of Columbia v Jerry M., 571 A.2d 178, 182, n.8 (D.C. 1990) (noting that District of Columbia had agreed to close facility as part of consent decree).

sent to Cedar Knoll primarily because of truancy.  Mr. Bigelow recalls being sent to Cedar Knoll

for being "beyond control."  The Presentence Investigation Report notes that Mr. Bigelow first

was committed to Cedar Knoll for a grand larceny and petit larceny case, and later because a

Person in Need of Supervision Complaint had been filed.  Presentence Investigation Report

(hereinafter PSI) at 6.  The report from which this information for the PSI was obtained also

states that a truancy complaint was filed against Mr. Bigelow on December 14, 1970. Regardless

of whether it was truancy or theft, placement at Cedar Knoll was a cruel punishment for a boy,

particularly one who had not yet become a teenager.

Not surprisingly given the history of Cedar Knoll, rather than serving to rehabilitate him

in any way, Mr. Bigelow's stay at Cedar Knoll proved to be a terrible turning point in his young

life.  He learned many things from the older boys with whom he was housed.  He learned to steal,

drink, use drugs and eventually sell drugs.  As he describes it, his attitude toward life became

reckless.  He cared little about himself or anyone else.

Mr. Bigelow spent the six years following his initial commitment to Cedar Knoll moving

in and out of juvenile detention facilities. He was released from Cedar Knoll in 1971, but

returned in 1973.  After being released again in 1974, he was sent to a youth shelter home in

1975.  In 1976, he was sent back to Cedar Knoll and then to another shelter home.  After leaving

the shelter home, he was sent back to Cedar Knoll.  After leaving Cedar Knoll in 1977, he was

sent to the Oak Hill juvenile detention facility and was released in 1977.

Less than a year later, in 1978, when he was nineteen years old, Mr. Bigelow was arrested

for the first time as an adult.  He was convicted of assault with intent to rob and sentenced to 4 to

12 years imprisonment.  While on parole, in 1984, he was arrested for assault with intent to rob

while armed.  He was convicted and sentenced to a consecutive 7 to 21 year term of imprisonment.  He was released in 1992.

After his release, Mr. Bigelow found that it was difficult to obtain employment with his criminal record.   In 1993, he got a job as a maintenance contractor at American University, where he worked for several years.

In the late 1990s, Mr. Bigelow obtained several other misdemeanor convictions:  in 1998 he was convicted of assault and battery, possession of cocaine and shoplifting, and in 1999, he was convicted of 2nd degree theft.

In 2003, Mr. Bigelow participated in the Third and Eats culinary school.  His mother confirms that while he participated in this program, Mr. Bigelow was a dedicated employee who went to work every morning at 6:00 a.m.  Mr. Bigelow enjoyed cooking and had hoped to obtain a paid position upon completion of the program.  Unfortunately, due to his record he was unable to find work in this field.  Instead, he assisted his father in his home improvement and trash hauling business.

Eventually, Mr. Bigelow again turned to drugs to support himself, and on March 1, 2005, he was arrest for the instant offense.  At the time of his arrest, he had in his possession a 25 caliber pistol and 322 ziplocks of heroin.

Almost immediately after undersigned counsel was appointed to represent him, Mr. Bigelow indicated that he wanted to accept responsibility and plead guilty.  In order to negotiate an appropriate plea, government counsel and undersigned counsel needed to properly assess Mr. Bigelow's prior record.  Doing so took many months because it was difficult to obtain the records for the offense that occurred twenty-five years ago, in 1979.  This delay was not related

to any hesitation by Mr. Bigelow in accepting responsibility, and on October 14, 2005, he entered

a plea of guilty to unlawful possession of a firearm and ammunition by a person convicted of a

crime punishable by imprisonment for a term exceeding one year and unlawful possession with

intent to distribute heroin.

Mr. Bigelow is now almost 47 years old and will appear before the Court for sentencing

on April 28, 2006. On behalf of Mr. Bigelow, counsel respectfully submits the following for the

Court's consideration in determining a reasonable sentence. See United States v. Booker, 543

U.S. 220 (2005) (sentences reviewable only for reasonableness).

## **Argument**

In determining a reasonable sentence, the Court must only consider the United States

Sentencing Guidelines (hereinafter "Guidelines"), along with the other factors set forth in 18

U.S.C. § 3553(a). Booker, 543 U.S. at 260. These factors include: "The nature and

circumstances of the offense and the history and characteristics of the defendant; . . . the kinds of

sentences available; . . . the need to avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct; and . . . the need to provide

restitution to any victims of the offense." 18 U.S.C. 3553(a). Pursuant to 18 U.S.C. § 3661,

> No limitation shall be placed on the information concerning the
> background, character, and conduct of a person convicted of an
> offense which a court of the United States may receive and
> consider for the purposes of imposing an appropriate sentence.

Following Booker, Courts need not justify sentences outside the applicable Guidelines range by

citing an applicable Guidelines grounds for departure or factors that take the case outside the

"heartland." Rather, as long as the sentence imposed is reasonable and supported by the factors

4

outlined in § 3553, the Court may disagree with the range proposed by the Guidelines and exercise discretion to impose a sentence outside the range.

After considering all of the factors set forth in § 3553(a), the Court must impose a sentence "that reflect[s] the seriousness of the offense, promote[s] respect for the law, provide[s] just punishment, afford[s] adequate deterrence, protect[s] the public, and effectively provide[s] the defendant with needed educational or vocational training and medical care." Booker, 543 U.S. at 260 (citing 18 U.S.C. § 3553(a)(2)).  Section 3582 of Title 18 provides:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph [(a)](2) [of § 3553]."  18 U.S.C. § 3553(a).

## I.  SENTENCING GUIDELINES

The Guidelines calculations for both the offense level and the criminal history category contained in the Presentence Investigation Report are incorrect because they erroneously assess points (both criminal history and offense level) based on a 1979 conviction for assault with intent to rob.  This conviction should not be counted for Guidelines purposes, because of the age of the conviction.

The Guidelines provide:

> Any prior sentence of imprisonment exceeding one year and one month that was imposed within fifteen years of the defendant's commencement of the instant offense is counted.  Also count any

> prior sentence of imprisonment exceeding one year and one month,
> whenever imposed, that *resulted in* the defendant being
> incarcerated during any part of such fifteen-year period.

U.S.S.G.  § 4A1.2(e) (emphasis added).  The 1979 conviction was not imposed within the fifteen

years prior to the instant offense, nor has it "resulted in the defendant being incarcerated during

any part of such fifteen-year period."

Mr. Bigelow was arrested for the offense that led to his 1979 conviction (for which he

was sentenced to 4 to 12 years) on September 27, 1978.  He was held from that date until he was

paroled on October 5, 1983.  Mr. Bigelow was arrested for the offense that led to his 1985

conviction on October 25, 1984.  He was held from that date until paroled again on February 4,

1994.

The 1985 conviction led to a consecutive sentence of 7 to 21 years.  Therefore, according

to the courts' Judgment and Commitment Orders, Mr. Bigelow was required to serve his 4 to 12

year sentence (the first sentence imposed) and then his 7 to 21 year sentence (the subsequently

imposed consecutive sentence).

The maximum amount of time that Mr. Bigelow could possibly have served for the 1979

conviction was 4,380 days (12 years x 365 days per year), minus the 1,440 days of good time

credits that, during that time period, was automatically (pursuant to statute) deducted, for a total

of 2,940 days.  Mr. Bigelow served 1,834 days from the date of his arrest on September 27, 1978,

until the date of his initial parole on October 5, 1983.  He then served 1,952 days from October

25, 1984, the date of his re-arrest for the offense that led to the 1985 conviction, through March

1, 1990, the date that the fifteen year period begins for determining which offenses can be

counted for Guidelines purposes in the instant case. (Mr. Bigelow was not actually paroled again

6

until February 4, 1994). Thus, Mr. Bigelow served 3,786 days – 846 days more than he statutorily owed for the 1979 offense – prior to the beginning of the applicable fifteen year period. Thus, prior to the beginning of the fifteen year period, Mr. Bigelow completed his 1979 sentence and began the 1984 sentence. The 1979 offense did not result in Mr. Bigelow being incarcerated during any part of the fifteen-year period.

For purposes of determining Mr. Bigelow's parole eligibility the officials that make those determinations lumped both sentences together and essentially considered them one sentence of 11 to 33 years. When paroled, Mr. Bigelow was (and is) considered by the parole officials to still be on parole for the 1979 offense. While that method of calculating Mr. Bigelow's parole eligibility may have been used to simplify the process, it does not change the nature of the sentences imposed. Mr. Bigelow received two separate consecutive sentences. Given the time that he served, if he had only the 1979 conviction, he would not have (could not have) continued to be incarcerated into the applicable fifteen year period. That sentence is not the sentence that resulted in his incarceration within the fifteen year period – the 1985 conviction is. For this reason, the 1979 conviction cannot be counted for purposes of assessing criminal history points or determining an appropriate offense level.

Eliminating the criminal history points and offense levels associated with th 1979 offense reduces the total offense level to 21 (base offense level 20, plus 4 for possessing the gun in connection with another offense, minus three for acceptance of responsibility), and reduces the criminal history category to IV. The sentencing range is then 57 to 71 months.

## II. FACTORS ASSOCIATED WITH THE GUIDELINES SENTENCING RANGE

### A. __Acceptance of Responsibility__

When considering the sentencing range recommended by the Guidelines, the Court should consider that in 2003, the Sentencing Commission issued a policy statement, contained in U.S.S.G. § 5K3.1, in which the Commission approved of a downward departure of up to 4 levels for defendants who agree to plead guilty very early on in the proceedings.  The merits of this policy statement are readily apparent.  Early dispositions conserve scarce prosecutorial and judicial resources.  Section 5K3.1 implements the Sentencing Commissions' desire that defendants who agree to plead early on in the proceedings receive additional credit.  Here, Mr. Bigelow agreed to pled early on in the proceedings.  The plea did not occur until more than seven months after Mr. Bigelow's arrest, not due to any hesitation by Mr. Bigelow, but due to the difficulties counsel encountered while trying to obtain the records of Mr. Bigelow's very old convictions.  During this period of time, Mr. Bigelow continued to waive his rights under the Speedy Trial Act.  Once the records were obtained, counsel was able to finalize the plea agreement and Mr. Bigelow entered his guilty plea.

Some districts have early disposition programs that have been authorized by the Attorney General and the United States Attorney for the district, pursuant to  § 5K3.1.  While many of these programs are only for immigration offenses, several districts have programs that include drug offenses..  For example, Arizona, New Mexico and Southern California have fast track programs not only for immigration cases, but also for specific types of drug offenses.  The Arizona and New Mexico programs include only marijuana cases, but the Southern California program includes all drugs.

Counsel recognizes § 5K3.1 requires a program authorized by the Attorney General and that there is no such authorized program in this jurisdiction.  Nonetheless, when determining a

8

reasonable sentence, the Court should consider Mr. Bigelow's early acceptance of responsibility as a factor weighing in favor of a lesser sentence because the Sentencing Commission expressed its opinion that it would be appropriate to do so.  The Court also should consider the disparities that arise between this case and similar cases in jurisdictions with early acceptance programs. With the elimination of the 1979 conviction for the reasons set forth above, a four level reduction in the offense level -- the maximum authorized by § 5K3.1 -- would reduce Mr. Bigelow's Guidelines range from 57 to 71 months, to 37 to 46 months.

### B.  Age of Convictions

Even if the Court found that the inclusion of the 1979 conviction is appropriate under the requirements of the Guidelines, the Court should consider the age of this conviction when determining an appropriate offense level.  The conviction occurred more than twenty five years before the instant offense, when Mr. Bigelow as only nineteen years old.

### C.  Double Counting Convictions

The Court should also consider that Mr. Bigelow's sentencing range under the Guidelines is based on the double counting of his criminal history.   Mr. Bigelow's sentence for the 922(g) charge is governed by U.S.S.G. § 2L1.2, which uses prior convictions to establish the offense level as well as the criminal history score.   Although the Guidelines permit this double counting, the Court can consider the double use of his record to obtain the Guideline range when determining whether a sentence within the range or another sentence would be reasonable. While it is "sound policy to increase a defendant's sentence based on his prior record , it is questionable whether a sentence should be increased twice on that basis."  United States v. Galvez-Barrios, 355 F. Supp. 2d 958, 961 (E.D. Wisc. 2005).  Under the PSI's erroneous

calculation of the Guidelines, Mr. Bigelow's only two prior felony convictions – one that occurred twenty-five years prior to the instant offense and one that occurred more than twenty years prior to the instant offense – increase the Guideline range by eight offense levels and three criminal history categories. Even under the correct Guidelines calculations, excluding the 1979 conviction, the use of the 1984 prior felony conviction increases the Guidelines range by four offense levels and two criminal history categories. Mr. Bigelow recognizes that his prior criminal history is relevant to the Court's analysis under 18 U.S.C. § 3553, however, he submits that the guidelines scheme greatly overstates this one factor.

## II.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Mr. Bigelow makes no excuses for his behavior: he was selling heroin and possessed a gun to protect himself while doing so. As the PSI details, Mr. Bigelow has a long history of substance abuse, and he turned to selling drugs to support himself and his addiction.

## III.  HISTORY AND CHARACTERISTICS OF MR. BIGELOW

Mr. Bigelow recognizes that he has a long record. Although it is unfortunate that Mr. Bigelow did not receive the help he needed when he was only eleven years old, he blames only himself for the choices he has made as an adult. He regrets the way he has led his life and, although he is only 46 years old, feels as though his life is at its end. He does not want to spend his remaining years in prison, but  he knows that he now faces a sentence to be imposed by this Court, the pending Maryland charge and his parole back-up time.  He hopes only that the Court will impose a sentence that will allow him to have some time to try again to do something product with his life.

As Judge Hellerstein of the United States District Court for the Southern District of New

York has noted, rehabilitation is a goal of punishment and "[t]hat goal cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of mankind . . . A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of punishment." United States v. Carvajal, 2005 WL 476125 (S.D.N.Y. Feb. 22, 2005). Other courts have similarly found that "life-extinguishing" sentences are unreasonable. See, e.g., United States v. Thomas, 360 F.Supp.2d 238, 243 (D. Mass. 2005).

## IV. KINDS OF SENTENCES AVAILABLE

### A. **Conditions at the District of Columbia Jail**

Mr. Bigelow has now served almost fourteen months at the District of Columbia Jail. As the Court is no doubt aware, serving a sentence at the D.C. Jail is substantially harsher than serving a sentence at a Bureau of Prisons facility. Because the D.C. Jail is designed for pretrial detention, there are no programing opportunities for inmates and very few productive ways for inmates to occupy their time. Recently, undersigned counsel has heard reports of insufficient supplies of food and hygiene products.[2] Inmates also spend significant portions of their time "on lock down," unable to leave their individual cells. While the Department of Corrections may maintain that these conditions are unavoidable or even necessary, the conditions do exact a harsher penalty. The Court should consider this in determining the length of additional time that

---

[2]Specifically, the Court may recall sentencing another client represented by undersigned counsel last month and that client requesting to begin serving his sentence immediately, rather than waiting for a Bureau of Prisons designation and self-surrendering. That client now deeply regrets that decision. Although he had previously spent time at the D.C. Jail, he found that the conditions there have deteriorated. According to his girlfriend, because only very basic food requirements are met and access to products through the canteen is limited, that client has lost approximately ten pounds.

Mr. Bigelow should serve.

### B. 500 Hour Substance Abuse Treatment Program

The Court should also consider Mr. Bigelow's long history of substance abuse.  He has

been attending AA/NA meetings at the D.C. Jail and could benefit from the Bureau of Prisons's

500 Hour Substance Abuse Treatment Program.  Inmates are not eligible for placement in this

program until they are 36 months from their release date.  Mr. Bigelow has served almost

fourteen months.  A sentence of 50 months or less would make him immediately eligible for the

program, and his participation in this program would reduce the risk of recidivism.

### Conclusion

For the foregoing reasons, and such other reasons as may be presented at the sentencing

hearing, Mr. Bigelow respectfully requests that the Court find that the appropriate Guidelines

sentencing range is 57 to 71 months and impose a reasonable sentence in consideration of the

information set forth above.


                              Respectfully submitted,


                                   /s/

                              _____
                              Mary Manning Petras
                              Assistant Federal Public Defender
                              625 Indiana Avenue, N.W.
                              Suite 550
                              Washington, D.C.   20004
                              (202) 208-7500